Wayne K. Caldwell (Bar No. 9466)
Aaron K. Bergman (Bar No. 13147)
BEARNSON & CALDWELL, LLC
399 North Main, Suite 270
Logan, Utah 84321
(435)752-6300 – Telephone
(435)752-6301 - Facsimile
Email: wcaldwell@bearnsonlaw.com
Email: abergman@bearnsonlaw.com
Please cc emails to: bjensen@bearnsonlaw.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| EBONY DAVIS, an individual,<br><br>Plaintiff,<br>vs.<br><br>DAVIS COUNTY SCHOOL DISTRICT, a county school district; and ROBERT REISBECK, an individual,<br><br>Defendants. | Case No. 1:24-cv-00190-CMR<br><br>**COMPLAINT**<br><br>**AND**<br><br>**JURY DEMAND** |

COMES NOW Plaintiff EBONY DAVIS ("Plaintiff"), by and through her legal counsel Aaron K. Bergman and Bearnson & Caldwell, LLC, and hereby complains against Defendants DAVIS COUNTY SCHOOL DISTRICT, a county school district; and ROBERT REISBECK, an individual ("Defendants"), as follows:

## NATURE OF ACTION

This is a civil rights action for damages, brought pursuant to Title VI of the Civil Rights Act for racial harassment and discrimination, as well as for violations of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.

## PARTIES

1.  Plaintiff EBONY DAVIS resides in Davis County, State of Utah.

2.  Defendant DAVIS COUNTY SCHOOL DISTRICT is a county school district for the Davis County, State of Utah.

3.  Defendant ROBERT REISBECK is an individual who under information and belief resides in Davis County, State of Utah.

## JURISDICTION & VENUE

4.  Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction.

5.  Pursuant to 28 U.S.C. § 1391, this Court is the appropriate venue.

## GENERAL ALLEGATIONS

6.  On September 15, 2021, the United States Department of Justice (hereinafter referred to as times as the "DOJ") issued its Notice of Findings of Race Discrimination in the Davis School District. See DOJ Notice of Findings of Race Discrimination in Davis County (Sept. 15, 2021), attached hereto as Exhibit "A."

7.  The DOJ's findings were extensively supported by:

    a. over 200 incidents of alleged racial discrimination;

  b. discipline narratives and student interventions documented from 17 schools during the immediately prior school years of 2017-2018, 2018-2019, and 2019-2020;

  c. District policies, procedures, handbooks, codes of conduct, and training;

  d. Five (5) site visits to the District;

  e. Eight (8) district-level interviews;

  f. Seventy (70) school-level interviews;

  g. Student focus-groups held with students at seven (7) junior high and high schools; and

  h. Interviews with additional parents, children, and community members.

8. The DOJ "found severe, pervasive, and objectively offensive race-based harassment" was regularly committed "in schools across the District" by students against other students.

9. The DOJ also found "severe, pervasive, and objectively offensive race-based harassment by staff in several District school and services."

10. The DOJ also found that the District violated the Equal Protection Rights guaranteed to its Black students under the Equal Protection Clause of the Fourteenth Amendment, and these pervasive violations had occurred through the District's "discriminatory enforcement of its codes of conduct and referrals to law enforcement."

**Complaint and Jury Demand**
*Davis v. Davis County School District, et. al.*
Case No. 1:22-cv-00048-DAO  Page 3

11. As a result of the DOJ's findings of pervasive racial discrimination occurring throughout the District's schools, on October 20, 2021 the United States of America and the District entered into a Settlement Agreement. See *Settlement Agreement Between U.S.A. and Davis School District*, attached hereto as Exhibit "B."

12. Under the Settlement Agreement, the District promised to "take all necessary and reasonable steps, consistent with Federal law, to end racial harassment, prevent its recurrence, eliminate any racially hostile environment that currently exists in its schools, programs, and activities, and remedy its effects."

13. The District agreed to take multiple steps in furtherance of the above promise, including a revamp of its policies and procedures; implementation of vigorous staff training; establishing a new Office of Equal Opportunity department; hiring an independent Consultant to assist the District in complying with Federal law and the Settlement Agreement; designating thirty (30) Coordinators to investigate and respond to racial discrimination complaints; developing a central electronic reporting/complaint management system; developing a complaint procedure; holding yearly reviews that assess the efficacy of the systems, policies, and procedures implemented in furtherance of the Settlement Agreement; issuing school-wide notices to all students, parents, and staff of the District's absolute commitment to creating and maintaining a safe and welcoming environment for all students that is free from harassment and discrimination; and engaging in numerous activities to change the culture of the District into one that is discrimination-

free, such as by holding regular assemblies about discrimination; conducting community outreach events; educating students, parents, and the public about discrimination, its effects, and the remedies available; and by collecting bi-annual surveys to assess the prevalence and effect of racial harassment within the District.

14. Knowing that the above material changes would take time to implement, the District agreed to create an "Interim Plan" which would be submitted to the United States of America no later than November 1, 2021. Furthermore, the District would "take immediate steps to ensure a prompt and equitable response to racial harassment and other discrimination," and create interim procedures for responding to and tracking incidents of racial discrimination as well as for assuring appropriate accountability for such occurrences.

15. The District disregarded the seriousness of the racist climate it had cultivated in its halls for years. In August of 2023, in a memorandum report presented to the District's Board, it was disclosed publicly that the District had still not implemented a Professional Development Program as required by its agreement with the Department of Justice. Furthermore, the District had still not implemented an Engagement Plan as required by its agreement with the Department of Justice.

16. The Professional Development Program was to include a series of instructor-led trainings and smaller school or department level workshops to teach staff how to identify, report, and respond to racial harassment and foster a safe and non-discriminatory

educational environment. The Engagement Plan was to provide age-appropriate bullying and harassment intervention programming to all District students that covers the type of conduct prohibited by District policy and the processes for notifying school staff of incidents of harassment.

17. Ebony Davis ("Davis") was a student attending the District. During her Junior Year at Layton High, Ebony began playing basketball on the varsity team, and was quickly a rising star in the program.

18. Ms. Davis's grades were commendable. She was enjoying school and was finding a great deal of satisfaction, friendship, and fulfillment in her activities as a member of the varsity basketball team.

19. Ms. Davis's experiences at the District, however, were clouded by a darker experience that had followed Davis ever since Junior High. Ms. Davis is Black, of African American – Hispanic descent, and ever since Junior High had been barraged with racist, demeaning remarks.

20. Being called the "n" word while walking to class in the hall, having a student turn off the lights in the classroom and shout "oh, where did Ebony go!"; having students touch her hair without permission; and having students ask for an "n-word pass" so that they could supposedly use the n-word in addressing her without recourse, were all common, regular, and at times daily experiences for Ebony while attending the District.

21. Ms. Davis was generally aware that the Department of Justice had issued harsh findings against the District regarding the ongoing racist environment existing within the District's schools and administration, and in an effort to help, Ms. Davis joined and became a committee member of the District's Multicultural Advisory Committee. The Committee would meet monthly, and was overseen by the Principal.

22. Notwithstanding, the racist and demeaning slurs and "jokes" from Ms. Davis's fellow students did not let up. Despite the Department of Justice's findings, it was as if nothing had really changed.

23. Unfortunately for Ms. Davis, the racist culture was not just a student-on-student-problem. The District's Athletic Director and coach of the girls' varsity basketball team, Coach Reisbeck, would regularly make statements directed at Ms. Davis that were racially charged and demeaning.

24. For instance, when Coach Reisbeck asked the team to line up tallest to shortest, he would commonly remark in front of Ms. Davis's peers that her hair does not "count" towards her overall height.

25. When money was mentioned in the course of a conversations involving Ms. Davis, Coach Reisbeck would state that such was "a White people problem," implying that Black people do not have money and are broke.

26. Also during practices, if the ball happened to hit Ms. Davis in the head, Coach Reisbeck would say "Oh, that doesn't hurt her head she has cushioning."

27. Coach Reisbeck would also regularly call out during scrimmages "Oh look, I put the only Black girl on the white team" or "The white team needs a girl with hops."

28. During Black-History-Month, Coach Reisbeck would say "Oh, [Ms. Davis], it's your month, we have to treat you special", or tell the other students to carry Ms. Davis to get a drink "because you're special."

29. Ms. Davis began having anxiety before practices or other times when she would have to interact with Coach Reisbeck. The anxiety experienced as a result of Coach Reisbeck's behavior was making Ms. Davis want to quit a sport she dearly loved, but she was scared and embarrassed. Ms. Davis was afraid that if she quit the varsity basketball team, her friends would believe she had let them down.

30. To save herself from this embarrassment, Ms. Davis deliberately allowed her grades which were historically good, to fall. If Ms. Davis could get her grades below a 2.0, she would *have to* stop playing.

31. An assistant coach noticed that Ms. Davis was displaying a significant amount of discomfort towards Coach Reisbeck, and was aware of the repeated negative, racially charged remarks that Coach Reisbeck had made towards Ms. Davis. As a result, the assistant coach reported Coach Reisbeck's harmful behavior to an Assistant Principal.

32. The Assistant Principal deliberately did not relay the report to the District's Office of Equity, as required by the District's agreement with the Department of Justice. With the help of an attorney and an additional six (6) weeks, the report finally made its

way to the District's Office of Equity. The Office of Equity issued findings on April 11, 2024, finding that Coach Reisbeck had intentionally engaged in racial harassment against Ms. Davis.

33. In the meantime, Ms. Davis deliberately allowed her GPA to fall to a 1.98 grade average. Ms. Davis was removed from the varsity basketball team, and as a result, could not play the final term of her Senior Year. Albeit, Ms. Davis's relationship to the sport had, as a result of Coach Reisbeck's behavior, entirely changed. To avoid feelings of anxiety and self-loathing, Ms. Davis avoided even entering into a basketball court.

34. When Ms. Davis attended further meetings on the Multicultural Advisory Committee, even though the goal of the Committee was to ameliorate racism in the District, no one, not even the Principal, mentioned anything to Ms. Davis regarding the discrimination she had faced at the hands of Coach Reisbeck.

35. On May 21, 2024, the District provided Coach Reisbeck with the following discipline: a written reprimand, and a transfer to a different position.

## FIRST CAUSE OF ACTION
### INTENTIONAL DISCRIMINATION IN VIOLATION OF TITLE VI
(Defendant Davis County School District)

36. Plaintiff restates the prior allegations, incorporating them herein by reference as if restated with full force and effect.

37. Under 42 U.S.C. § 2000d, Title VI of the Civil Rights Act of 1964 absolutely demands: "No person in the United States shall, on the ground of race, color, or national

origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

38. For all times relevant to this action, the Defendant Davis County School District received federal financial assistance, and is subject to and required to comply with the Civil Rights Act of 1964, as amended.

39. For all times relevant to this action, Plaintiff is a Black student who attended the District and was entitled to the protections provided under the Civil Rights Act of 1964, as amended.

40. In violation of the Act, Defendant intentionally or with deliberate indifference discriminated against Plaintiff and because of her race excluded her from Defendant's programs, services, and activities.

41. Defendant fostered a culture of racism against Black students.

42. For instance, Defendant Reisbeck regularly mocked Ms. Davis for physical attributes specific to Black students, including her hair, the color of her skin, and her ability to "jump." Defendant Reisbeck also regularly mocked Ms. Davis by telling her that her skin color was inextricably connected to her wealth or inability to thrive in society. Defendant Reisbeck also deliberately mocked, at Ms. Davis's expense, the accomplishments of Black Americans *en masse*, effectively telling Ms. Davis by way of insult that Black American accomplishments were not worthy of his praise.

43. Defendant Reisbeck's harassments against Ms. Davis were the result of a longstanding policy in the District to discriminate against Black students. Ms. Davis regularly experienced such harassment at the hands of students, to which there was no meaningful adult intervention. The harassment continued with the District's own chief staff, even the High School coach and Athletic Director, Defendant Reisbeck.

44. When Assistant Principal was finally compelled to share an assistant coach's report of Defendant Reisbeck's discriminatory behavior, the Assistant Principal questioned "Are you really going to investigate this?"

45. Such blatant condoning of racial harassment and discrimination would not occur absent a prevalent policy to discriminate against Black students, evidenced by way of fostering racial harassment within the District's programs, services, and activities.

46. The conduct by each White student in harassing Ms. Davis, as well as the conduct of Defendant Reisbeck was objectively offensive, race-based, harassment – the very type of harassment that Defendant had repeatedly let go unchecked. As the DOJ's report found:

> Black students reported strikingly similar experiences throughout the District: White and other non-Black students routinely called Black students the n-word and other racial epithets, called them monkeys or apes and said that their skin was dirty or looked like feces. Peers taunted Black students by making monkey noises at them, touching and pulling their hair without permission, repeatedly referencing slavery and lynching and telling Black students "go pick cotton" and "you are my slave." Harassment related to slavery increased when schools taught the subject, which some Black students felt was not taught in a respectful manner. White and other non-

Black students demanded that Black students give them an "N-Word Pass," which non-Black students claimed gave them permission to use the n-word with impunity, including to and around Black students. If Black students resisted these demands, they were sometimes threatened or physically assaulted. These incidents took place on a daily or weekly basis.

47.  As a result of Defendant's policy, Ms. Davis was discriminated against as a result of the color of her skin. Ms. Davis was denied meaningful participation in the District's education and extracurricular programs, services, and activities. And as a result, Ms. Davis experienced anxiety, fear, humiliation, loss of reputation, and loss of association with her peers.

48.  The exact quality and amount of Ms. Davis's damages will be determined later at trial. In addition, Plaintiff seeks her costs, reasonable attorney's fees, prejudgment interest, post-judgment interest, and any other relief the Court deems appropriate under the circumstances.

## SECOND CAUSE OF ACTION
**United States Const., amend. I and XIV**
**42 U.S.C. § 1983**
(All Defendants)

49.  Plaintiff restates the prior allegations, incorporating them herein by reference as if restated with full force and effect.

50.  Pursuant to 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

51. Under the Fourteenth Amendment, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." United States Const., amend. XIV.

52. Defendants intentionally, or with deliberate indifference, subjected Ms. Davis to repeated, racial harassment. Ms. Davis experienced the racist behavior from other students and Defendant Reisbeck often, even at times daily.

53. As described *supra*, Defendant Davis County School District has an affirmative policy to allow for and foster racial harassment and discrimination against students of color. This policy is, on a regular basis, carried out by Defendant's staff, students, and even by Defendant's Athletic Director. Extensive investigation supporting the existence of this policy has been obtained by way of 200 incidents of racial discrimination; discipline narratives from 17 of Defendant's schools, as well as the Defendant's policies, procedures, handbooks, codes of conduct and training; conducting 70 school-level interviews, five (5) separate site visits to the District, eight (8) District level interviews and seven (7) focus groups at various junior highs and high schools in

Defendant's District; and by conducting additional interviews with parents, children and amongst the community.

54. Based on this investigation, a reliable third-party investigator, the Department of Justice, has concluded that the District and its school suffered from severe, pervasive, objectively offensive and wide-spread race-based harassment and discrimination regularly occurring between staff and students against students of color. Based on these facts, and more that may well be discovered, the Defendant Davis County School District has an affirmative, longstanding policy to foster racial harassment and discrimination against students of color.

55. For all relevant times, no student would expect to receive the District's programs, services, and activities while simultaneously being subjected to mocking, demeaning, and humiliating verbal assaults on account of the student's skin color.

56. For Ms. Davis, the racial harassment was so severe, pervasive, and objectively offensive that she deliberately abandoned her education, avoided the basketball court altogether, and experienced loss of reputation, loss of association, fear, anxiety, and humiliation. Thus, the racial harassment perpetrated by Defendants was so severe, pervasive, and objectively offensive that it deprived Ms. Davis of meaningful access to the District's programs, services, and activities.

57. In addition to the foregoing property interest which Defendants deprived Ms. Davis of without due process of law (*supra*), Defendants also deprived Ms. Davis of a

critical fundamental liberty interest secured by the substantive Due Process Clause of the Fourteenth Amendment: the liberty interest of "association."

58.     "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 460, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958). The Supreme Court "has repeatedly held that rights of association are within the ambit of the constitutional protections afforded by the First and Fourteenth Amendments." *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 543, 83 S. Ct. 889, 9 L. Ed. 2d 929 (1963).

59.     When Defendants created and indeed continued to foster a culture and policy of racial discrimination, it had the effect, which is intended by such insidious schemes, to destroy one race's ability to associate with another race. And indeed, such is exactly what happened to Ms. Davis.

60.     As a result of the repeated racial harassment experienced at the Defendants' hands by Ms. Davis, she was compelled to disassociate herself not only from the District's programs, services, and activities, but also her peers and friends who were White. As a result, Defendants took away from Ms. Davis those friends, those experiences, even the benefits inherent in such associations in the cultivation of ideas in the educational

environment, and did so by creating an educational environment where Ms. Davis's race was inherently unwelcome.

61. It has long been recognized in our Nation's history that the deprivation of peoples' right to associate, whether such be on the basis of race or for any other reason, is contrary to that liberty which exists in a free, ordered society. Wherefore, Defendants cannot create such schisms in society without also meeting the demands of *strict scrutiny*. Namely, that the Defendants' racial separation of Ms. Davis from her peers served a compelling State interest, and was narrowly tailored so serve that compelling state interest.

62. The ability to engage in racial harassment is not a compelling state interest. Wherefore, Defendants' deprivation of Ms. Davis's ability to associate with her peers on account of her race violated her rights under the First Amendment, as well as under the substantive due process clause of the Fourteenth Amendment.

63. As a result of the foregoing unconstitutional property and liberty deprivations, Ms. Davis has been damaged. The exact quality and amount of Ms. Davis's damages will be determined later at trial. In addition, Plaintiff seeks her costs, reasonable attorney's fees, prejudgment interest, post-judgment interest, and any other relief the Court deems appropriate under the circumstances.

## **PUNITIVE DAMAGES**

(Defendant Reisbeck)

64. Plaintiff restates the prior allegations, incorporating them herein by reference as if restated with full force and effect.

65. Defendant Reisbeck's conduct in subjecting Ms. Davis to racial harassment is worthy of a punitive damage award.

66. As the Athletic Director of the District's Highschool, Defendant Reisbeck was well aware of the Department of Justice's findings and of the District's written agreement with the Department of Justice to *end* racial discrimination in the District.

67. As the Athletic Director of the District's Highschool, Defendant Reisbeck held a position of great importance to the District, and of great authority and influence over the District's interactions with the community, with students, and of determining the culture of the District itself.

68. For Defendant Reisbeck to hold the position he did, be aware of the constitutionally inappropriate racist culture existing in the District, of the Department of Justice's threat hanging over the District to eradicate its federal funding, and still continue to engage in overt racial harassment against a Black student evidences (a) evil motive or intent, or (b) reckless or callous indifference to the federally protected rights of others.

69. There is a great benefit to awarding punitive damages against Defendant Reisbeck. The District has also been told and knows that its racially discriminatory

educational environment must *end*. But clearly that message has not been received with sufficient force.

70. For instance, when Defendant Reisbeck was reported to have engaged in racial harassment, the assistant principal questioned the Office of Equity 'are we really doing this?' This disregard for the constitutional rights of Black students is not limited to Defendant Reisbeck and Ms. Davis. There have been many instances, post the Department of Justice investigation, of students and staff engaging in racial harassment against Black students and receiving in response little to no corrective discipline or consequence.

71. Despite other lawsuits, despite threats by the Department of Justice, the Athletic Director of the District's Highschool sports program was found to still be engaging in repeated, ongoing racial harassment against a Black student.

72. It is time for the constitutional rights of Ms. Davis and other Black Students like her to be taken seriously.

73. Imposing individual financial accountability on individual wrongdoers in the District, which otherwise will simply be covered by the State Risk Management Fund, will be the spark that Ms. Davis deserves, and that the citizens of Utah need.

## JURY DEMAND

74. In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

The Court should award Plaintiffs with the following relief,

75. Judgment for general damages and special damages;

76. Prejudgment and post-judgment interest;

77. Punitive Damages

78. Costs and Plaintiffs' reasonable attorney's fees as permitted by statute, rule, regulation, contract, or equity; and

79. Any other relief the Court deems just and equitable under the circumstances.

DATED this 18th day of November, 2024.

                              BEARNSON & CALDWELL, LLC

                              /s/ Aaron K. Bergman
                              Brad H. Bearnson
                              Wayne K. Caldwell
                              Aaron K. Bergman
                              *Attorneys for Plaintiffs*

**Complaint and Jury Demand**
*Davis v. Davis County School District, et. al.*
Case No. 1:22-cv-00048-DAO                                        Page 19