# EXHIBIT "A"



**U.S. Department of Justice**
**Civil Rights Division**
**Educational Opportunities Section**

**United States Attorney's Office**
**District of Utah**

DJ 169-77-26 SS:WP:AV:JJ
USAO: 2019V00231

U.S. Mail: 950 Pennsylvania Ave., NW
4CON, Rm. 10.1117
Washington, DC 20530
Overnight: 150 M Street, NE,
10th Floor, Rm. 1117
Washington, DC 20002

September 15, 2021

***By Electronic Mail***

Benjamin Onofrio, General Counsel
Davis School District
45 E. State St.
P.O. Box 588
Farmington, UT 84025-0588

**Re: Notice of Findings of Race Discrimination in the Davis School District**

Dear Mr. Onofrio:

We write to provide notice of the results of the United States Department of Justice's ("DOJ" or "the Department") investigation into allegations of race discrimination against students in the Davis School District ("District"). The complaints alleged that the District (1) failed to address widespread race-based harassment of students of color, specifically Black and Asian-American students; (2) disciplined Black students more harshly than white students for comparable behavior; and (3) denied Black students the ability to form student groups while allowing other students to do so. On the basis of these complaints, DOJ initiated an investigation under Title IV of the Civil Rights Act of 1964 ("Title IV"), 42 U.S.C. § 2000c, *et seq*.

Title IV authorizes the Department to address complaints that a school board is depriving students of equal protection based on race, color, religion, sex, or national origin and to bring civil actions in federal court under certain circumstances. *See* 42 U.S.C. §§ 2000c-6. On July 17, 2019, DOJ notified the District that we had opened a Title IV investigation into allegations of racial harassment and other forms of discrimination against students. In our opening letter and subsequent correspondence, we requested that the District provide information and documents, principally focusing on the period from the 2015-2016 school year to 2019-2020.

In response to eight requests for information issued by DOJ, the District produced, and DOJ reviewed, more than 200 incident files containing allegations of racial harassment and other discrimination.[1] DOJ reviewed and analyzed discipline narratives and student interventions

[1] District officials acknowledged that employees were likely aware of even more racial harassment and discrimination

documentation from 17 schools in the 2017-2018, 2018-2019, and 2019-2020 school years.[2] DOJ also reviewed relevant District policies and procedures, handbooks, codes of conduct, and trainings. DOJ analyzed information about the roles and responsibilities of local law enforcement, including School Resource Officers (SROs), in reporting, responding to, and resolving complaints of race-based harassment and discipline within the District.

During five site visits to the District,[3] the Department interviewed eight District-level employees and 70 school-level employees, including principals, assistant principals, administrative interns, guidance counselors, teachers, and ground duties, who supervise playgrounds, hallways, and other common areas. The Department held focus groups with students at seven junior high and high schools and interviewed additional parents, children, and community members.

During our focus groups and other interviews, Black students reported strikingly similar experiences throughout the District: white and other non-Black students routinely called Black students the n-word and other racial epithets, called them monkeys or apes and said that their skin was dirty or looked like feces. Peers taunted Black students by making monkey noises at them, touching and pulling their hair without permission, repeatedly referencing slavery and lynching, and telling Black students "go pick cotton" and "you are my slave." Harassment related to slavery increased when schools taught the subject, which some Black students felt was not taught in a respectful or considerate manner. White and other non-Black students demanded that Black students give them an "N-Word Pass," which non-Black students claimed gave them permission to use the n-word with impunity, including to and around Black students. If Black students resisted these demands, they were sometimes threatened or physically assaulted. These incidents took place on a daily or weekly basis. Some students, now in middle and high school, said they had experienced racial harassment each year since they were kindergarteners. Students who attended school in other districts told us that the harassment they experienced in Davis schools was worse by far.

Black students told the Department that incidents happened frequently, at times in front of teachers and other staff, and some would not respond or intervene in any way. Some students said that they told teachers or other staff when they experienced harassment initially, but when the staff did not respond, the students became discouraged and doubted that staff would ever intervene. Many Black students said the harassment was so pervasive and happened so often in front of adults that they concluded school employees condoned the behavior and believed reporting it further would be futile. Some students also said they feared that if they told adults about the racial harassment their harassers would retaliate and the harassment would get worse. Several said that they disliked attending school and at times missed school because of racial harassment.

Students also told us in interviews that administrators and teachers targeted them for discipline. Students believed they were disciplined for behavior that white students also engaged in without consequence. Several Black students also reported feeling that some teachers, most of whom are white, were less welcoming and helpful academically to them in comparison to white

---

reports that were not captured in the District's database "Encore" or other records. Indeed, various administrators acknowledged that they did not enter all complaints in Encore. Moreover, administrators admitted they did not maintain many documents, including complaints of racial harassment and other forms of discrimination. DOJ notified the District that it should retain all documents relevant to this investigation.

[2] Despite repeated requests, the District's production of this information remains incomplete.

[3] DOJ conducted two in-person and three virtual site visits. In addition, DOJ personnel traveled to Davis County, Utah to meet with and interview complainants and community members.

students. Black students reported that they wanted access to student organizations similar to those offered to other students that would serve as a forum for discussing and addressing common experiences but their schools had not approved requests for such clubs.

## LEGAL ANALYSIS

In the context of K-12 education, Title IV authorizes DOJ to address complaints to the effect that a child or children "are being deprived by a public school board of the equal protection of the laws" in violation of their constitutional rights. 42 U.S.C. § 2000c-6(a)(1). Under Title IV, if DOJ determines that such a complaint has merit, the Department must notify the school district and provide it with an opportunity to voluntarily resolve the matter before filing a lawsuit in federal court. *See* 42 U.S.C. § 2000c-6(a). Based on our investigation and as described in greater detail below, we have concluded that the complaints are meritorious. Specifically, the District deprived students of equal protection by (1) responding in a clearly unreasonable manner to widespread, pervasive race-based harassment of Black and Asian-American students by both students and staff that created a hostile environment and of which it had notice; (2) subjecting Black students to harsher, more frequent discipline than white students who engaged in similar behavior; and (3) denying Black students the ability to form student groups.

### A. THE DISTRICT WAS DELIBERATELY INDIFFERENT TO KNOWN STUDENT HARASSMENT BASED ON RACE

#### 1. Legal Standard

A school district may violate students' equal protection rights by intentionally discriminating against them as members of an identifiable class or by "consciously acquiesc[ing]" to known harassment by other students or staff. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir. 1999) (equal protection claim for sex-based harassment). As courts have observed in private damages cases, a school district acquiesces to harassment based on a protected class when it knows of the harassment but responds in a clearly unreasonable manner—in other words, when it is deliberately indifferent. *See id.*; *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir. 2003) ("Deliberate indifference is found if the school administrator responds to known peer harassment in a manner that is clearly unreasonable.") (citing *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 649 (1999) (internal quotation marks and alterations omitted);[4] *see also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) ("A finding of deliberate indifference depends on the adequacy of a school district's response to the [racial] harassment."). A school district that is deliberately indifferent to known student harassment *itself* discriminates in violation of the Equal Protection Clause. *See Murrell*, 186 F.3d at 1250 ("[T]o state a claim of deliberate discriminatory conduct, [plaintiff] must state facts sufficient to show defendants actually knew of and acquiesced in [the harasser's] behavior.") (internal quotation marks and alterations omitted); *see also Mosavi v. Mt. San Antonio Coll.*, 805 F. App'x 502, 505 (9th Cir. 2020) ("Public school administrators who fail to take protective

---

[4] Although *Davis* dealt with sexual harassment under Title IX, circuit courts, including the Tenth Circuit, have applied the same analysis to find a violation of the Equal Protection Clause when school officials are deliberately indifferent to known harassment. *See, e.g., Murrell*, 186 F.3d at 1250–51; *Bryant v. Independent Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003) (directing district court to apply the Title IX deliberate indifference standard to Title VI claim); *Sturdivant v. Blue Valley Unified Sch. Dist., USD 229*, No. 18-CV-2661-JWL, 2020 WL 3545650, at *6 (D. Kan. June 30, 2020) (relying on *Murrell* and *Bryant* to find that the deliberate indifference standard is the same under the Equal Protection Clause, Title VI, and Title IX), *appeal docketed*, No. 20-3147 (10th Cir. July 22, 2020); *Doe ex rel. Conner v. Unified Sch. Dist. 233,* No. 12-2285-JTM, 2013 WL 3984336, at *9 (D. Kan. Aug. 1, 2013) (citing *DiStiso v. Cook,* 691 F.3d 226, 241 (2d Cir. 2012)). Because the Tenth Circuit applies the *Davis* deliberate indifference standard to Equal Protection claims, we cite generally to cases applying the *Davis* standard.

measures against religious harassment may be held liable for religious discrimination in violation of the equal protection guarantees of the . . . federal constitution if a plaintiff can show that the defendants either intentionally discriminated against the plaintiff or acted with deliberate indifference.").

Specifically, in a private suit for monetary damages, a school district must have "actual knowledge" of peer harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Courts have noted that "simple acts of teasing and name-calling among school children" are not considered severe, pervasive, and objectively offensive. *Id.* at 652. In contrast, courts have held that when a student is subjected to racial epithets, threats of violence, and physical assault by their peers, the harassment is considered severe, pervasive, and objectively offensive. In *Bryant*, the Tenth Circuit found a district intentionally discriminated against a Black student when a principal was aware, but took no action when other students used racial slurs; carved "KKK" into desks; placed notes in Black students' lockers and notebooks; wore T-shirts and drove cars to school with the confederate flag, swastikas, KKK insignias, and hangman nooses. 334 F.3d at 931–32 (Title VI claim). In *Bryant*, the student was subjected to the unabated use of the n-word by other students. As the Tenth Circuit explained,

> It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.

*Bryant*, 334 F.3d at 932 (quoting *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998) (equal protection and Title VI claims for a racially hostile environment)); *see also DiStiso*, 691 F.3d at 242–43 ("[The] use of the reviled epithet 'n*****,' raises a question of severe harassment going beyond simple teasing and name-calling."). The Second Circuit similarly affirmed a district court's finding of school district liability under Title VI (and upheld a $1 million award) for a student-victim who was, among other things, regularly "taunted, harassed, menaced, and physically assaulted" and whose "peers made frequent pejorative references to his skin tone, calling him a 'n*****' nearly every day." *Zeno*, 702 F.3d at 666–67.

Thus, when a school district is aware of alleged harassment, it must respond in manner that is not clearly unreasonable by taking timely and appropriate action to investigate or otherwise determine what occurred. If an investigation reveals that discriminatory harassment has occurred, the school must respond in a manner that is not clearly unreasonable to address the harassment and hostile environment. *See, e.g., Murrell*, 186 F.3d at 1247–48 (principal's failure to investigate or discipline student who engaged in harassment was evidence of deliberate indifference; teacher's failure to remedy harassment and act of concealing the harassment was evidence of deliberate indifference); *Monteiro*, 158 F.3d at 1034 ("Once on notice of the problem, a school district has a legal duty to take reasonable steps to eliminate a racially hostile environment." (internal quotation marks and citation omitted)). When a school knows "what they had been doing (if anything) had not sufficed[, f]ailure . . . to try something else can show deliberate indifference." *See Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1314 (10th Cir. 2020) (citing *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)) (Title IX claim); *see also Flores*, 324 F.3d at 1135–36. A school district that fails to respond to a known hostile environment intentionally discriminates against its students. *Bryant*, 334 F.3d at 932–33. Indeed, when a school district's employees, particularly its building leaders, choose to take no action when confronted with a racially hostile environment, that "[c]hoice implicates [discriminatory] intent." *Id.* at 33.

This framework applies equally when employees harass students. *See, e.g., Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006) (applying *Davis* and *Murrell* to claim that school was deliberately indifferent to employee's harassment of student). Yet, while courts recognize that "simple acts of teasing" is common among school children, *Davis*, 526 U.S. at 650, teachers who engage in "racial name-calling" create a hostile environment because "a student who faces racial, public denigration by the teacher . . . may reasonably be left with a sense of inferiority relative to her classmates." *Doe v. Los Angeles Unified Sch. Dist.*, No. 2:16-cv-00305, 2017 WL 797152, at *18 (C.D. Cal. Feb. 27, 2017) (equal protection claim for staff-on-student race-based harassment). Indeed, " '[a] sense of inferiority affects the motivation of a child to learn' and may deprive African American students of the educational benefits they would otherwise receive." *Id.* (quoting *Brown v. Bd. of Ed. of Topeka, Kan.*, 347 U.S. 483, 494, (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.,* 349 U.S. 294 (1955)).

### 2. <u>The District Was Deliberately Indifferent to Known Racial Harassment</u>

***Student-on-Student Harassment***

DOJ found severe, pervasive, and objectively offensive race-based harassment in schools across the District. Parents and students informed DOJ that white students repeatedly called Black students the n-word despite the District's knowledge and without consequence. *See Monteiro*, 158 F.3d at 1034 ("It goes without saying that being called [the n-word] by your white peers . . . exposes Black children to a risk of discrimination that is so substantial and obvious that a failure to act can only be the result of deliberate indifference." (quotation marks omitted)). We learned of incidents in which white students referred to Black students as dirty, asked why they did not wash their skin, and commented that their skin looked like feces. White students also called Asian-American students pejorative slurs, such as "yellow" and "squinty" and told them to "Go back to China." *See, e.g., DiStiso*, 691 F.3d at 242 (kindergarten students engaged in racial harassment by disparaging a Black boy's race and suggesting that his skin remained dirty even after washing); *Zeno*, 702 F.3d at 667 (pejorative references to student's skin tone was racial harassment). At some schools, white students who called Black students the n-word also wore and displayed confederate flags. *See Bryant*, 334 F.3d at 931–32 (hostile environment created when, among other things, non-Black students wore and displayed confederate flags and used racial slurs). Parents and students across the District told us that these forms of harassment were so commonplace, they expected them to happen. *See Spencer v. Univ. of N.M. Bd. of Regents*, No. 15-cv-141-MCA-SCY, 2016 WL 10592223 at * 4 (D.N.M. Jan. 11, 2016) ("minimalist response," or "where the harasser and other students are left to believe that the harassing behavior has the tacit approval of the school" may show deliberate indifference) (internal quotation marks and citations omitted).

DOJ found that the District was on notice of the racially hostile environment. Although some students told us that continuing to report racial slurs was futile, many parents and students persisted in reporting incidents of racial harassment to teachers, counselors, and school- and district-level administrators. *See id.*; *Davis*, 526 U.S. at 650. The District's documents show it had actual knowledge of at least 212 incidents in which Black students were called the n-word across 27 schools, as well as additional incidents of race-based harassment of Black or Asian-American students.[5]

Finally, we found that the District was deliberately indifferent to the racially hostile climate

[5] Because of DOJ's requests for harassment incidents focused on a sampling of schools and the District's incomplete responses, we believe this is a fraction of all such incidents. It also does not include incidents in which students used other racial epithets.

in many of its schools. Despite being on notice of pervasive racially hostile incidents across District schools, frequently the District ignored parent, student, and advocate complaints completely, dismissed them as "inconclusive" even when corroborated by other witnesses, or merely told the harassing student(s) not to do it again, even when the student had harassed Black or Asian-American students previously. *See, e.g.*, *Davis*, 526 U.S. at 645 (finding a school district may be liable for peer-on-peer harassment when its deliberate indifference makes students vulnerable to continued harassment); *DiStiso*, 691 F.3d at 245 (admonishing that no one should argue "that a reasonable response to *repeated* complaints of *repeated* student racial name-calling was to do nothing." (emphasis in original)); *Flores*, 324 F.3d at 1136 (principal was deliberately indifferent to harassment complaint when he investigated some, but not all accused); *Zeno*, 702 F.3d at 669 (when discipline does not deter the harassment, it is deliberately indifferent to proceed with that same response and not more); *Vance*, 231 F.3d at 261–62 (continuing to use efforts that have proven ineffective, such as "talking to the offenders," is clearly unreasonable). At times, the District told Black and Asian-American students not to be so sensitive or made excuses for harassing students by explaining that they were "not trying to be racist." *See Bryant*, 334 F.3d at 932 ("[A] school where [racial slurs and epithets] occur[] unchecked is utterly failing in its mandate to provide a nondiscriminatory educational environment." (quoting *Monteiro,* 158 F.3d at 1034)). Several teachers admitted to hearing students use the n-word,[6] and did not report it to administrators. Their response: telling students to "watch their language." *See DiStiso*, 691 F.3d at 244–45 (reasonable jury could find teacher was deliberately indifferent to complaints of racial harassment where she "offered no evidence that she ever spoke to a kindergarten student about *racial* name-calling" and principal did not conduct "a 'full' investigation" of the incidents and merely spoke to the teacher (emphasis in original)). Likewise, in October 2019, a white student dressed as Hitler for Halloween, marched in a parade throughout his elementary school while performing the Nazi salute, and no school staff stopped him or reported his costume and behavior to school administration.[7]

The District designated a "compliance officer" to receive complaints of racial harassment and to conduct investigations into those complaints.[8] Our investigation revealed complaints of race-based harassment that parents or other staff elevated to the District compliance officer, but the District failed to investigate or otherwise respond to. *See Zeno*, 702 F.3d at 671 (finding district-level civil rights compliance officer's failure to investigate racial harassment complaint clearly unreasonable). The District also improperly relied on an SRO's determination that students

---

[6] Several incidents illustrate District staff's insensitivity to the harm of racial epithets. For example, during one of our focus groups, a Black student reported that he told the assistant principal that a white student called him the n-word. During a discussion about the incident, that assistant principal repeated the word "n***er", in full, to this Black student. *Cf. Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a mere offensive utterance, the word 'n***er" is pure anathema to African–Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n***er' by a supervisor in the presence of his subordinates." (internal quotation marks omitted) (citing *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993), *overruled on other grounds by Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006)). Minutes later, the same assistant principal repeated the word to DOJ attorneys. At another school, a teacher told DOJ she intervened upon hearing "two colored people saying they are n***ers." At yet another school, while being interviewed by DOJ's investigative team, a staff member was perplexed at how to describe a Black student's race. She compared the student to a Black attorney on DOJ's investigative team, referring to them both as "colored."

[7] *See, e.g.,* Allyson Chiu, *'Intolerably offensive': Boy's Nazi costume at elementary school Halloween parade sparks outrage,* WASHINGTON POST (Nov. 4, 2019), https://www.washingtonpost.com/nation/2019/11/04/nazi-costume-utah-elementary-school-creekside/.

[8] *11IR-100 Nondiscrimination Policy and Complaint Procedures,* DAVIS SCHOOL DISTRICT POLICIES AND PROCEDURES (Jan. 26, 2016).

should not be criminally charged in deciding not to conduct its own investigation into whether the harassment violated the student code of conduct and the rights of a targeted student. *Cf. Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 (10th Cir. 2008) (school districts should not rely solely on prosecutor's decision not to bring criminal case when responding to sexual harassment). In several instances, the District took no action in response to parents' repeated complaints, only to conduct a belated investigation when parents, as a last resort, went to the media. *See Doe*, 2017 WL 797152, at *13 (denying summary judgment where a jury could infer based on "the sequence of events . . . that defendants initially pursued disciplinary action . . . because of media attention . . . and then abandoned the effort when public attention subsided"); *Zeno*, 702 F.3d at 666 ("A failure to respond, a response that only follows after a lengthy and unjustified delay, and a response that amounts to deliberate indifference to discrimination have all been found inadequate." (internal quotation marks, references, and alterations omitted)); *Bryant*, 334 F.3d at 933 n. 3 (school district may be deliberately indifferent for the period between notice and investigation even if it later investigated harassment). As a consequence of this dismissive attitude to serious racial harassment, a District-wide racially hostile environment went unabated.

***Staff-on-Student Harassment***

The Department also found severe, pervasive, and objectively offensive race-based harassment by staff in several District schools and services. Students and parents reported incidents in which District staff targeted and assaulted students of color, ridiculed students in front of their peers, endorsed pejorative and harmful stereotypes of people of color in class, and retaliated against students of color for reporting harassment. *See id.* at *18, 20 (district's decision not to discipline teacher who ridiculed student and act of retaliation against a student for reporting staff-on-student racial harassment supported an equal protection claim) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005)).

The District's documents confirm its notice of each incident or earlier incidents involving other complainants that were similar and close in time to later harassment. *See Escue*, 450 F.3d at 1156; *T.Y. v. Shawnee Mission Sch. Dist.*, No. 17-2589, 2018 WL 2722501 at *7–8 (D. Kan. June 6, 2018) (prior episodes of harassment against other complainants constituted notice where the "earlier episodes of harassment were similar, frequent, and close in time to" the alleged assault); *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1286–87 (10th Cir. 2017), *cert. denied*, __U.S. __, 138 S. Ct. 1267 (2018) (prior harassment allegations were sufficiently similar). Our investigation found that the District responded to these incidents in a manner that was clearly unreasonable in light of known circumstances. The Department found that the District disregarded student witnesses who corroborated allegations and took no or minimal action to eliminate the hostile environment. For example, one school received a complaint that a teacher constantly ridiculed a Hispanic student and taunted him for working at a taco truck (though the student did not). An administrator interviewed other students who confirmed that the teacher "openly picks on certain students." Yet, the administrator took no steps to remedy the hostile environment. Where there was a response to harassment or retaliation for reporting harassment, it was "minimalist," *Spencer*, 2016 WL 10592223 at *4, and staff remained in charge of educating or supervising the very students they degraded through racial harassment. In response to one incident, the District's "investigation" was designed to vindicate its staff rather than identify and respond to harassment. *Cf. Murrell*, 186 F.3d at 1248 (teacher's failure to remedy harassment and act of concealing the harassment was evidence of deliberate indifference). As a result, the District left students of color vulnerable to continued abuse. *See Davis*, 526 U.S. at 645. When parents reported a serious incident of physical harassment directly to District officials, those officials took no steps to ensure an appropriate response, and another student was subsequently exposed to a similar incident. *See Zeno*, 702 F.3d

at 671 (where district administrator could "have prompted an earlier and adjusted administrative response," her failure to do so was deliberate indifference).

In addition to our conclusion that the District's response to these incidents was clearly unreasonable, we noted other significant failures in the District's practices. We found that school or department administrators failed to report complaints against staff in violation of District policy. We also found that District officials failed to supervise a department director's investigation into serious allegations of physical harassment that endangered a student, despite longstanding concerns that the director did not follow District policies and protected certain employees from discipline.

Despite widespread student-on-student and staff-on-student harassment, the District did not train administrators or teachers on how to identify and respond to incidents of racial harassment. To date, the District has produced only one administrator training that discussed racial harassment on a single PowerPoint slide and was created after our investigation began. This lack of training in the face of nearly uniform failures to recognize and respond to widespread racial incidents is clearly unreasonable in light of known circumstances. *Cf. id.* at 670–71 (once a district knows of widespread harassment it is clearly unreasonable to continue to use training that does not specifically address racial harassment).

## B. THE DISTRICT'S DISCIPLINE PRACTICES VIOLATED BLACK STUDENTS' EQUAL PROTECTION RIGHTS

As discussed below, DOJ's investigation concluded that the District discriminated against Black students in its enforcement of discipline policies and practices.

"The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019) (internal quotation marks omitted) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998)). "[D]isparate impact—while not itself automatically or presumptively unlawful—may well inform a court's investigation into the law's underlying intent or purpose." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012) (J. Gorsuch). Courts have recognized that "[o]fficial conduct is not unconstitutional merely because it produces a disproportionately adverse effect upon a racial minority," but "must ultimately be traced to a racially discriminatory purpose." *Tasby v. Estes*, 643 F.2d 1103, 1107-08 (5th Cir. 1981) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 65-66 (1980) (elections); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (zoning); *Washington v. Davis*, 426 U.S. 229, 239–46 (1976) (public employment); *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 208 (1973) (public schools)).

A plaintiff may establish racially discriminatory intent through direct or circumstantial evidence that a student's race motivated the school officials' actions. *See Vill. of Arlington Heights*, 429 U.S. at 266. Circumstantial evidence can include "comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic. . . ." *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 522 (7th Cir. 1994). In *Bryant*, the Tenth Circuit found that Black students set forth a prima facie case of intentional racial discrimination because "[t]hey alleged that they were suspended after the February 8, 2000, fight while Caucasian students who participated in the fight were not suspended." 334 F.3d at 930 (Title VI claim involving a student-on-student fight). Importantly, the Black students alleged the discipline they received—suspension—was different than the discipline the white students received—no suspension. *Id.* Indeed, disproportionate punishment of Black students may be the

product of a racially discriminatory purpose when it is accompanied by "arbitrary disciplinary practices, undeserved or unreasonable punishment of black students, or failure to discipline white students for similar misconduct." *Tasby*, 643 F.2d at 1108.

The Department collected and analyzed extensive evidence about the District's disciplinary practices. We reviewed examples of disciplinary records of white and Black students who were similarly situated in relevant respects, statistical data on disciplinary practices in the District, statements of District employees, school and District discipline customs and practices, and District training for administrators and teachers responsible for administering discipline. Based on the evidence from our site visits and the analyses of the related data, we concluded that the District has deprived Black students the equal protection of the law through its discriminatory enforcement of its codes of conduct and referrals to law enforcement.

Based on the District's discipline files from the 2017-18 and 2018-19 school years, we found Black students received harsher discipline consequences than white students for similar offenses, even when the students were close in age/grade, had similar records of prior misconduct, were disciplined for the same conduct code violation, and where the narrative descriptions of the misconduct suggested that the incidents were of comparable severity.[9] In several cases, Black students were excluded from class through in- or out-of-school suspensions whereas their white peers received a conference. This is particularly true for offenses such as "disruptive behavior," which requires a highly subjective determination of whether there was a violation of the code of conduct.[10] As a result, Black students missed out on valuable instructional time, which may contribute to or worsen achievement gaps.[11] The Department also found at least one incident in which an SRO charged a Black student criminally while a white student received a conference for similar behavior.

The District has not presented a legitimate explanation for why Black and white students were treated differently under the District's discipline policy and in law enforcement referrals. In fact, during our interviews, District officials admitted to DOJ that the District's discipline data revealed that District staff treated students of color, and in particular Black and Native American

---

[9] As with race-based harassment, our investigation also revealed that when parents and students complained that Black students were disciplined unfairly and targeted because of their race, schools disregarded their complaints. For example, administrators at one elementary school admitted to DOJ that they did not respond to a parent's complaint they discriminated against her son by disciplining him more harshly than his white peers. At another elementary school, we met with a woman who worked as a reading tutor and lunch and ground duty. She told us that she disciplined a Black student, who she called "colored," for talking in the lunch room. The student raised a concern that she targeted him but allowed white students to talk. She told the student she could not be "prejudiced" because her family includes "colored" people. She did not report this allegation to anyone in the school and no one investigated it. The student remained under her supervision at lunch and in her reading group. She received no training on reporting or responding to allegations of discrimination.

[10] Research shows that bias is more likely to play a role in subjective categories of discipline, which involve greater staff discretion because they are harder to define and observe objectively than offenses such as "Possession of Narcotics." *See, e.g.,* JOHANNA WALD, CHARLES HAMILTON HOUSTON INST. FOR RACE & JUST. AT HARVARD L. SCH., CAN 'DE-BIASING' STRATEGIES HELP TO REDUCE RACIAL DISPARITIES IN SCHOOL DISCIPLINE? 2-3 (2014), http://www.indiana.edu/~atlantic/wp-content/uploads/2014/03/Implicit-Bias_031214.pdf; RUSSELL SKIBA & NATASHA WILLIAMS, THE EQUITY PROJECT AT INDIANA UNIV., ARE BLACK KIDS WORSE?: MYTHS AND FACTS ABOUT RACIAL DIFFERENCES IN BEHAVIOR (2014); Michael Rocque & Raymond Paternoster, *Understanding the Antecedents of the "School-to-Jail" Link: The Relationship Between Race and School Discipline*, 101 J. CRIM. L. & CRIMINOLOGY 633, 662 (2011).

[11] Francis A. Pearman II, et al., *Are Achievement Gaps Related to Discipline? Evidence from National Data*, AM. EDUC. RSCH. ASS'N, Oct. 2019, https://journals.sagepub.com/doi/full/10.1177/2332858419875440.

students, differently than white students. Despite knowing for at least four years that discipline data revealed disparities, the District took no steps to train its staff, implement changes to discipline codes and practices, or otherwise take corrective action in light of these disparities.[12] Put simply, the District knew it engaged in discriminatory discipline and did nothing. DOJ's investigation did not find any legitimate basis for the more punitive discipline of Black students when compared to similarly situated white students.

## C. THE DISTRICT VIOLATED THE EQUAL PROTECTION CLAUSE WHEN IT REFUSED TO ALLOW BLACK STUDENTS TO FORM STUDENT GROUPS WHILE ALLOWING OTHER STUDENTS TO DO SO

Finally, DOJ's investigation found that the District violated the equal protection rights of Black students seeking to form and maintain student groups.

Schools may in some circumstances violate the Equal Protection Clause by denying students the ability to form student groups. *See, e.g., Hudson v. Harris*, 478 F.2d 244, 246 (10th Cir. 1973) (student group may bring equal protection claim where college denied its application to formalize); *E. High Gay/Straight All. v. Bd. of Educ. of Salt Lake City Sch. Dist*., 81 F. Supp. 2d 1166, 1185–86 (D. Utah 1999) (K-12 equal protection claim); *see also Sigma Chi Fraternity v. Regents of Univ. of Colo.*, 258 F. Supp. 515, 529 (D. Colo. 1966) (no equal protection violation where a university resolution treated all student groups similarly and required them all to not discriminate on the basis of race).[13] Decisions to deny students the ability to form student groups must not be motivated by racial animus. *Cf. Yick Wo v. Hopkins,* 118 U.S. 356 (1886) (selective enforcement was purposeful, not merely incidental, discrimination against those of Chinese descent).[14]

Several Black students in the District explained that they want to form student groups because such groups would help them feel less isolated, a part of a common community, and give them a forum to explore their culture, which some said was particularly important as adopted members of white families. Despite documented requests to District schools to form such groups, school officials denied Black students' requests and granted requests by similarly situated non-Black students. District schools sponsor a variety of such groups—from Latinos in Action, a District-sponsored mentoring and community service program for Latinx students that includes a

---

[12] The District launched a Social and Emotional Learning (SEL) initiative to help adults and students "acquire and effectively apply the knowledge, attitudes, and skills necessary to understand and manage emotions, set and achieve positive goals, feel and show empathy for others, establish and maintain positive relationships, and make responsible decisions." DAVIS SCH. DIST., SOCIAL EMOTIONAL LEARNING, https://www.davis.k12.ut.us/departments/student-family-resources/social-emotional-learning (last visited June 15, 2021). The District has devoted significant resources to this initiative and a few administrators said this program addressed discipline disparities; however, the SEL materials produced by the District rarely address race, racial discrimination, or race-based harassment if at all.

[13] The Equal Access Act (EAA), which provides the primary vehicle for challenging schools' decisions to "deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting . . . on the basis of the religious, political, philosophical, or other content of the speech at such meetings," 20 U.S.C. § 4071(a), does not preclude equal protection claims. *See E. High Gay/Straight All.*, 81 F. Supp. 2d at 1185–86.

[14] To be sure, "school districts . . . retain a significant measure of authority over the type of officially recognized activities in which their students participate." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 240–41 (1990) (citing *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988); *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986)). And schools have authority to address situations that "materially and substantially interfere with the orderly conduct of educational activities within the school." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 509 (1969) (citation and internal quotation marks omitted). But school restrictions on student expression must be justified by more than "undifferentiated fear or apprehension of disturbance." *Id.* at 508.

credited course, to noncurricular, school-based K-Pop Clubs for Korean music and dance enthusiasts. School and District officials offered no legal justification for denying requests from Black students to form such student groups, which would be open to all interested students. One administrator told us that she "didn't think [such a club] was appropriate for school." The same school official told a Black student that the school would only support a "multicultural club." District officials did not help these Black students form student groups, despite a clear and documented need to reduce the experience of racial isolation, which was compounded by the racially hostile climate in District schools. These explanations and offers of alternative groups that were not responsive to Black students' requests are not sufficient to overcome the "grave suspicion" the underlies heightened scrutiny. *See SECSYS, LLC*, 666 F.3d at 687 (state action that "intentionally discriminat[es] against historically ostracized groups—African-Americans . . . , for example—are, experience teaches, so rarely defensible on any ground other than a wish to harm and subjugate that they always come to us under grave suspicion and subject to heightened review.") (citations omitted).

**CONCLUSION**

The Department's investigation uncovered systemic failures in the District's handling of complaints of racial student-on-student and staff-on-student harassment, discipline of Black students, and refusal to allow Black students to form student groups. The Department appreciates the cooperation of the District, its administrators, faculty, staff, and students, throughout the course of this investigation and looks forward to continuing to work with the District to resolve all outstanding concerns.

If you have any questions about this letter, please do not hesitate to contact Aria S. Vaughan at aria.vaughan@usdoj.gov or Jadine Johnson at jadine.johnson@usdoj.gov.

Sincerely,

Andrea T. Martinez,
Acting United States Attorney
Office of the United States Attorney
District of Utah

Shaheena A. Simons, Chief
Whitney M. Pellegrino,
Principal Deputy Chief
Educational Opportunities Section
Civil Rights Division